

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00174-CV

IN THE INTEREST OF O.M., A
CHILD

----------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In two issues, O.M.'s mother (Mother) challenges the legal and factual

sufficiency of the evidence to support the trial court's finding that termination of

her parental rights is in O.M.'s best interest.[2]  We affirm.

### Standard of Review

Termination decisions must be supported by clear and convincing

evidence.   Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *see also*

---

[1]*See* Tex. R. App. P. 47.4.

[2]O.M.'s father signed an affidavit of relinquishment of his rights and does not appeal the termination order.

*id.* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer

to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent engaged in the behavior described in one of the subsections of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Applicable Law**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

3

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases, and other factors not on the list may also be considered when appropriate.  *In re C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

**Applicable Facts and Analysis**

O.M. was about a year and four months old at the time of the bench trial and too young to express his desires.  Mother testified that she had used methamphetamine before she knew she was pregnant but that she had stopped when she found out she was pregnant.  Mother denied using methamphetamine regularly after O.M. was born, but she admitted relapsing one time in February 2011 when O.M. was a little over a month old; the caseworker was called to the house that time,[3] and Mother's drug screen was positive.  At that time, the Department removed both O.M. and his older brother.  Mother later admitted

---

[3]The Department already had a pending case with Mother regarding her oldest son.

using again on "multiple occasions" during the time her children were removed, but she could not remember the dates. By the time of trial, Mother's rights to her oldest son had already been terminated.[4]

Mother admitted that she had signed and reviewed a service plan, but she did not comply with the following: she did not visit O.M. after her rights to her oldest son were terminated, she did not work on parenting skills with her caseworker, she did not obtain and maintain a legal source of income, and she was arrested. Mother said the caseworker failed to set up visits with O.M. for her and did not "comply" with helping her work on her parenting skills. Mother also admitted missing one random drug screen. While the case was pending, Mother lived with her own mother (Grandmother), and they lived in at least three different residences. According to Mother, the utilities were working at all of those residences. Mother was convicted of theft in March 2012 and sentenced to eight months in jail. Mother testified that she went to Serenity House for a drug and alcohol assessment. Mother also testified that she had attended NA meetings and had provided her caseworker with proof. She believed she had complied with the requirement to obtain a psychological assessment.

At the time of trial, Mother had been incarcerated for almost four months. Mother did not believe it was in O.M.'s best interest that her rights be terminated because she was working on her GED, she was in the right state of mind, and

---

[4]Mother's rights to that son were terminated in September 2011.

she knew what was best for her son. Her release date was August 31, 2012. She felt that termination was premature.

Mother testified that she planned to live with Grandmother upon her release from jail. She denied that Grandmother had a history of abusing or neglecting her, but she admitted that Grandmother had a history of drug abuse. According to Mother, however,

> [p]eople change, and my mother is not a drug user, she doesn't use drugs anymore and she hasn't in a very long time. Her home is very safe. She lives in a very nice neighborhood, very nice home, and she takes well good care of her home; and I will be there on account of -- until I get on my feet and I'm able to get a job and get -- get things on my own; that's where I will be going home to.

Mother testified that while the cases with her two sons were pending, she worked at Papa Johns for about a week and at Cheddars for two weeks. She also worked at Luby's. But she had not worked anywhere for longer than a month. Mother testified that she already had a job at Sonic lined up for when she was released from jail and that she would be able to get an apartment within about two weeks after her release. Mother contended that she had a difficult time contacting and communicating with her caseworker and obtaining information from her.

Jill King, Mother's caseworker, testified that she had tried to contact Mother regarding visits with O.M. in September and October after Mother's rights to her oldest son had been terminated. According to King, she had a hard time contacting Mother, but she was able to contact Grandmother and tell her that

8

Mother needed to come to visits with O.M. In October 2011, King tried sending a letter regarding visits to the address for Mother in the Department's files. King did not get any response. In November, King contacted Mother through Mother's aunt; Mother told King she was not sure she could come to visits. King testified that she had contacted Mother many times after that and had scheduled visits for Mother, but Mother did not visit O.M. King agreed that the visits Mother had missed since January, however, were due to her incarceration.

King testified that Mother did complete the parenting classes part of her service plan. At one visitation before the rights to her oldest son were terminated, Mother had a difficult time managing both of the children. Mother lost touch with the Department several times during the case. King was concerned about Mother's ability to maintain stable housing. According to King, Mother had "tendencies to have issues with her family members," and living with family members and some of her friends was "a problem for her."

According to King, Mother's use of methamphetamine was the primary concern in the case. King testified that Mother did do an initial drug assessment, but she did not attend the inpatient treatment services ordered by the trial court. She also testified that Mother missed four random drug tests instead of one. She attended one session of counseling but did not submit to a psychological assessment. Mother also attended some NA meetings but not all of them.

King tried to visit four of the residences where Mother had lived while the Department's cases with her two children were pending, but she was never able

9

to contact anyone so she could go inside. Only one full home study was done for O.M.; that potential relative placement, Mother's maternal grandmother (Great Grandmother), was turned down by the Department. According to King, both Great Grandmother and Grandmother were described by references as drug addicts. In addition, King described Grandmother as having an extensive CPS and criminal history. Grandmother was living with Great Grandmother, so if O.M. were returned to Mother, he would be living with them as well. King further testified that Mother did not have a "stable" relationship with Grandmother.

King testified that O.M. was doing well and was living in a home with his older brother. She said that the home was a prospective adoptive home for both boys. O.M. was developmentally on target and physically and mentally healthy; his needs were being met in the foster home. He was very bonded to his older brother and the foster family. King testified that O.M. did not like strangers and that moving would be very hard for him. The foster home was the only one he had lived in since being removed from Mother's care.

The Department had vetted nine family placements for O.M. and had ruled out all of them; several of them had said they were not interested in caring for O.M. Although the trial judge had ordered a family team meeting so that family members interested in caring for O.M. could attend, none did so. The Department's plan was for O.M. to be adopted by his then-current foster parents, but King did not think there would be any problem with future adoption if that fell

through. King believed termination of Mother's parental rights to be in O.M.'s best interest.

Lisa Wester, a CASA volunteer, testified that she had visited the foster family's home several times. The boys were happy in the foster home; it was clean and orderly, with toys and sufficient places to sleep. She believed the foster home to be an appropriate and safe environment in which O.M. was thriving. She also believed it to be in O.M.'s best interest to stay in that home and to be adopted. Wester had visited with Mother and had offered to assist her, but Mother had not complied with her plan. Wester did not think a permanent managing conservatorship would be as stable for O.M. as termination.

Considering the above evidence as it relates to the statutory and *Holley* factors—especially Mother's lack of progress in accepting services and dealing with her drug addiction, and the lack of a safe and stable home environment for O.M. if he were returned to Mother—we conclude and hold that the trial court's finding that termination of Mother's parental rights is in O.M.'s best interest is supported by both legally and factually sufficient evidence. We therefore overrule both of Mother's issues and affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED: September 27, 2012

11